UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

PETER JANSON and CELESTE JANSON,    )
                                    )
        Plaintiffs,                    )     Case No. _3:25cv00469_____
                                      )
v.                                         )
                                      )     **VERIFIED COMPLAINT AND**
ERIE INSURANCE COMPANY,          )     **JURY DEMAND**
                                      )
        Defendant,               )

Plaintiffs Peter Janson and Celeste Janson (jointly the "Jansons"), by and through their attorney, John M. Janson, and as and for their Complaint state as follows:

## INTRODUCTION

1.     This case concerns the responsibility of an out-of-state homeowners insurance company to cover the total damages caused by the insurer's unilaterally chosen contractors in their deficient attempts to address the homeowners' covered property damage claims. In this case, the homeowners' historic Virginia residence flooded when a supply pipe to an upstairs toilet failed. The insurer unilaterally selected and retained contractors to remediate the water damage and to remove the homeowners' personal belongings. The remediation contractor's faulty and deficient workmanship significantly escalated the damage to the home. The storage company also failed to properly remove and store the homeowner's belongings. To date, the insurer has failed and refused to fully cover the homeowners' losses. As a result, the homeowners, their young son James, and their dogs have been forced to live in a small hotel room and have been without their personal possessions for nearly two years.

## THE PARTIES

2.      Plaintiffs Peter Janson and Celeste Janson are a Virginia husband and wife who own a historic home located at the address known as 1183 Highway 15, Clarksville, Virginia 23927.

3.      Defendant Erie Insurance Company ("Erie") is a corporation organized under the laws of the State of Pennsylvania with its home office located at 100 Erie Insurance Plaza, Erie, Pennsylvania 16530.

4.      Erie is duly authorized to engage in the insurance business in the Commonwealth of Virginia.  Erie maintains a branch office in Richmond, Virginia at the postal address of P.O. Box 28120, Richmond, Virginia 23228-0120.

5.      The Janson's are the named insureds on ErieSecure Home Insurance Policy – Virginia, Policy No. Q572012346 (the "Policy").  This Policy covers the Janson's' residence at 1183 Highway 15, Clarksville, Virginia 23927, and its contents.

## JURISDICTION AND VENUE

6.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between each Plaintiff and the Defendant, and the amount in controversy exceeds $75,000.

7.      Specifically, diversity of citizenship exists because the Janson's are residents of Virginia and Erie is a resident of Pennsylvania.

8.      Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this district because a substantial part of the events giving rise to the claim occurred in this district, and the real property that is the subject of the action is situated in this district.

## JURY DEMAND

9.      The Janson's hereby request a jury trial of all issues and claims set forth in this Complaint.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

10.     The Janson's' Clarksville, Virginia home was originally built in 1842, was remodeled in 1955, and was renovated again in 2005.

11.     The home contains numerous custom features, including a hydronic heated flooring system, Lutron lighting system, and Andersen doors and windows.   These significant and expensive upgrades were installed by the owner previous to the Janson Family and were one of the many reasons the Janson's and their lender wanted a replacement value provision in their policy.  Erie was aware of these expensive improvements from day one and aware that they needed to insure the property accordingly.

12.     In or around September 2010, after several inspections of the property by Erie representatives, the policy was underwritten and the Jansons obtained the Erie Policy covering the Janson's home and its contents at replacement value.  This coverage being in place was a pre-requisite to the Jansons being able to close escrow and occupy the property as their home.  A true copy of the Policy is attached hereto as **Exhibit A**.

13.     The Policy also provides for additional living expenses when a loss insured causes the residence to become uninhabitable.

14.     In addition, the Policy provides for "AUTOMATIC ADJUSTMENT OF COVERAGE AMOUNTS." (Exhibit A, Policy, p. 11.)  The Policy provides the insured "with a guard against the effects of inflation in construction costs" for the covered "Dwelling, Other Structures and Personal Property."  (*Id.*)

3

15.    The "amount of insurance applying to the Dwelling is the '**replacement cost**' at the time of loss." (*Id.*)

16.    The Policy provides that the amount of insurance applying to Personal Property Coverage "is the amount shown on the '**Declarations**.'" (*Id.*) If, during the Policy period, "there is an increase in costs to due inflation and a loss occurs, [Erie] will reflect the increase in the amount of insurance before making payment." (*Id.*) This could have the effect of providing personal property coverage in an amount greater than the amount listed on the Policy's Declarations page. (*Id.*) However, "[i]f for any reason other than inflation, the amount of insurance shown on the '**Declarations**' for [the insured's] Personal Property Coverage does not adequately cover the value of the property, the amount of insurance shown on the '**Declarations**' will be the full amount available should a loss occur." (*Id.*)

17.    Another section of the Policy contains the heading "Additional Living Expenses." (*Id.* p. 5.) This section provides that if a covered property loss occurs that makes the insured's residence uninhabitable, Erie "will pay all reasonable living expenses while [the insured] and members of [the insured's] household reside elsewhere." (*Id.*)

18.    A true copy of the Declarations page applicable to the Policy for the period September 20, 2022, through September 20, 2023, is attached hereto as **Exhibit B.** This Declarations page states, in part: "The amount of insurance applying to the dwelling is the replacement cost at the time of the loss, subject to policy conditions and requirements. The estimated replacement cost of the dwelling is $276,000."

19.    The Declarations page states that the amount of insurance applicable to the Jansons' personal property is $207,000. A deductible of $1,000 applies to property claims. (Exhibit B, Declarations page.)

4

20.     The Jansons paid all premiums for the Policy up to and including June 18, 2023, the date of their loss.

21.     The Policy and the corollary Declarations page were in full force and effect on the date that the Janson's loss occurred.

22.     On June 18, 2023, the Jansons, while out of town, received a call late in the afternoon from their dog sitter, indicating that their home was flooding.

23.     A local handyman immediately investigated the matter for the Janson's and turned off the main breaker and well water in an attempt to mitigate the danger and damage.

24.     The Jansons immediately returned home and discovered that the supply pipe to the upstairs toilet had failed and had sprayed large amounts of water throughout the upstairs bathroom.

25.     Water from this leak drained through the ceiling and lights into the hallway below. The water spread into the kitchen and closet under the stairs. It began to seep under the living room flooring and spread partially into the kitchen. Water also permeated the electrical cabinet closet on the first floor from the ceiling above.

26.     On June 19, 2023, the Janson's called Erie and made a property damage claim for the water damage to their home and personal belongings.

27.     Erie agreed that the water damage to the home and the Jansons' personal belongings was a risk covered by the Policy.

28.     Erie accepted coverage for the water damage claim and assigned it Claim Number A00005073990.

29.     At all times following the loss, the Jansons cooperated with the investigation and insurance adjustment, made the home available for inspection, and provided documents whenever requested.

30.     The Jansons, prior to filing suit, complied with all condition's precedent to recovery, or such conditions were waived by Erie.

31.     Erie unilaterally chose and retained the contractor that attempted to repair the water damage to the Jansons' home and indicated that they would begin work immediately.

32.     Erie was immediately made aware of the specialized Lutron lighting system throughout the home.

33.     Erie was also clearly and immediately made aware of the unique commercial grade hydronic closed loop multi-zone heated floor system.

34.     The Jansons immediately called INRAY, a Lutron light specialist. While keeping Erie informed via voicemail, the Janson's engaged a Lutron specialist to come look at and estimate the repair or replacement of the lighting system.  That estimate at that time was $50,000 for materials and that much again for labor.

35.     Erie's first adjustor assigned to the project, Dee Clary, initially indicated to the Jansons that Erie would immediately retain a local remediation specialist to remediate the water damage to the home.  However, the adjuster later informed the Jansons that Erie was unable to come to terms with the local remediation specialist qualified to do the work immediately as upon information and belief the contractor could not work with Dee Clary, the Erie adjustor assigned to the loss as he apparently had not been paid properly for work done for Erie in the past.

36.     Instead, unbeknownst to the Janson's at the time, Erie contracted with the contractor Servpro to conduct the remediation work on the Janson's' home.

37.     Servpro did not begin any remediation work until June 30, 2023.  This amounted to a delay of 11 days from the date the Jansons filed their property damage claim with Erie.  This

6

delay exponentially increased the damage caused by the mold, mildew, and high moisture content as this was during the hottest part of summer and in the middle of an intense thunderstorm season.

38.     Throughout these 11 days the Jansons attempted on multiple occasions to contact Dee Clary for progress updates on the timeline for Servpro's arrival to remediate the home. They left multiple voicemails, with no response.

39.     The Jansons then took it upon themselves to contact Servpro to determine when they would begin remediation work. The Jansons should not have had to undergo the stress and emotional toll associated with the delays to remediation and communication with those contracted to remediate the home.

40.     Upon information and belief, the lack of competence and lack of communication with the Erie employee assigned to the loss directly created a situation where damages were ignored by Erie, not mitigated as required. Leaving the home uninhabitable, soaked in water and without air conditioning during the hottest and highest humidity dog days of summer was Erie's fault and so were the resulting damages which began occurring long after the initial flooding as Erie failed to send out a contractor to mitigate after they agreed to do so.

41.     During this time, while waiting for Erie to perform their obligations, the Jansons purchased and set up blast fans and dehumidifiers in an attempt to mitigate damages.

42.     Had Erie performed as agreed their contractor should have taken care of this immediately, and the Jansons would not have had to undergo the stress and emotional toll associated with attempting to dry out their home and possessions.

43.     Around that time Erie also unilaterally chose and contracted with the company White Glove to pack out the Jansons' personal belongings in the rooms containing water damage and to place such personal belongings in storage.

7

44.    On June 28, 2023, White Glove packed out most of the items in the Jansons' living room and hallway.

45.    White Glove workers then removed some but not all items from the kitchen, as Servpro had indicated that only a portion of the kitchen required remediation.

46.    White Glove also moved items from the upstairs child's bedroom into the other upstairs bedroom because the child's bedroom had mold growing in it.  At that time the other upstairs bedroom appeared unaffected.  The items moved were stacked, stuffed, wedged, and piled haphazardly into main bedroom, with no organization or concern for items.

47.    White Glove was unable to pack out the Jansons' entire home because it did not bring enough vans to store all the personal belongings.   Some items, such as a portion of the sectional sofa, were left in the living room. The living room was subsequently affected by the water damage as due to the lack of immediate attention by Erie water had migrated under the Pergo flooring.

48.    Before Servpro began any remediation work, the Jansons asked Servpro representatives to secure the unaffected rooms of the home with zipwalls to mitigate the amount of dust collected in those areas.  They did not do so.

49.    The Jansons also asked Servpro representatives to notify them if Servpro had to go further into the kitchen than originally anticipated so that they could have White Glove return and remove the remainder of the items in the kitchen, particularly an heirloom Antique Hand Crafted Grandfather clock.   The Jansons specifically instructed Servpro not to attempt to move the Grandfather clock without notifying them so that they could make appropriate arrangements for the clock's removal.

50.     The Jansons also informed Servpro representatives that heated floor pipes ran under the floors throughout the home.

51.     Servpro performed remediation work in the hallway and kitchen on July 1, 5, and 6, 2023.  The interval between the June 18 loss and July 1 appearance of Erie's contractor allowed mold to permeate the home.

52.     While performing the kitchen remediation work on July 6, 2023, Servpro representatives – in direct contravention to the Jansons' prior instructions -- took it upon themselves to move items from the kitchen to the living room.

53.     During this process, Servpro representatives moved and damaged the Grandfather clock in the kitchen.

54.     On July 7, 2023, Servpro representatives began the "remediation" work on the as yet undamaged tile floor and concrete backer board in the kitchen.  As they ripped out the floor and chipped up the backer board with picks and digging bars, they dispersed Silica dust throughout the Jansons' home.  In accordance with Erie's instructions, the Jansons had left the air conditioning unit running.  The resulting flow of air caused Silica dust to be dispersed in and to contaminate the entire house, including the HVAC system and all the items left in the upstairs bedroom and the living and guest room addition.  Silica dust contaminated all items of the Jansons' personal property left in the home after White Glove performed its pack out.

55.     While Servpro was unnecessarily destroying the floors of the Jansons' home, they also destroyed the closed-loop, heated flooring system.  They gouged the pipes while scraping up the floor with floor scrapers and digging bars.  They crimped the pipes as they hung them on the coat hooks in the hallway to get them out of the way.  This extensive damage was not caused by the initial flooding but by Erie's contractor Servpro sending an incompetent and unqualified crew

that destroyed the heating system. Again, the heating system was not damaged by the initial flooding problems. This loss, several weeks after the initial event is entirely on Erie and as such Erie needs to put back the flooring as it existed prior to their contractor unnecessarily destroying undamaged portions of the home.

56.    In addition, the negligent Servpro representatives broke a number of Anderson doors as they used ladders to push such doors open and closed and just treated them roughly in general.

57.    Erie supervised or otherwise controlled the above actions of its unilaterally chosen contractors, Servpro and White Glove, and ratified the actions and work performed by these contractors. To be very clear here, Servpro and White Glove were hired by and worked for Erie. These contractors were never hired by, nor did they work for the Jansons.

58.    Upon information and belief, subsequent to these unilateral actions by Erie, Erie gave the Jansons money to pay Servpro as if to act like Servapro worked for the Jansons, not Erie.

59.    During this systematic destruction of what was left of the home, Erie's field representative / "Umpire" / "Adjustor", Dee Clary was reluctant to authorize alternative housing for the Janson Family even though their home was unquestionably uninhabitable. Further, during the duration of the remediation, she never visited the home to see the extent of the damage or to gain an understanding of the inability to remain in the home during remediation.

60.    In the meantime, the Janson family was living with their young son and their four dogs in a hotel room. Although Erie acknowledged that such alternate living accommodations were covered under the Jansons' Policy, Erie was slow to make the rental payments for the hotel.

61.    During this the remediation, Erie's attempt to provide alternative housing seemed to be done on a piecemeal day to day basis and the Jansons repeatedly had to contact Dee Clary to

have hotel rent approved so that they could access their rooms. Throughout this process Dee Clary failed to answer the phone or respond to voicemails from the Jansons. The Janson Family should not have had to undergo the stress and emotional toll associated with the uncertainty of access to the temporary housing.

62.    On July 11, 2023, Peter received an injury to his hamstring and back while living in the hotel. This incident involved one of the dogs and would not have occurred had the Jansons been able to return to their home or had they been housed in another suitable dwelling.

63.    In addition, although Erie acknowledged that the cost of food for the family was covered under the Policy during the time that the Jansons were staying in alternative living accommodations, Erie was slow to reimburse the Jansons for such costs. In an effort to expediate meal reimbursements the Jansons made weekly trips to deliver receipts to the local insurance office for scanning and submission to Erie. A job that the claim representatives should have done.

64.    On July 28, 2023, the Janson's requested an update from Erie about Servpro returning to correct and finish the remediation of the house and questioned the search for suitable housing.

65.    As a result of verbal complaints to the local office about Dee Clary the Jansons were assigned John Musante as a new adjuster. He required the Jansons to use a text claim system to submit concerns and complaints. Any concerns submitted to this system went unanswered.

66.    On July 31, 2023, a, Servpro representative made a brief site visit and indicated that the company's work was done. In response to the Jansons' concerns about mold, Silica dust contamination, and exposed wiring, the Servpro representative told the Jansons to test for mold and Silica if that was a concern. The Jansons requested a hard copy of the Servpro contract, which they only received many months later.

11

67.    After multiple requests for testing for silica contamination were denied by Musante, the Jansons contacted an environmental testing agency themselves to attempt to gain some clarification on the damage done to their home by the negligent Servpro remediation team. The Jansons should not have had to undergo the stress and emotional toll associated with the uncertainty of the safety of their home and possessions.

68.    Their requests eventually prompted Erie to assign a new adjustor to take John Musante's place. Adjuster John Evans ("Mr. Evans") took over their claim. Upon information and belief, at that time he Was the first Erie employee that actually set foot on the property after the unnecessary destruction of the heating system and silica contamination of the home some several months after the loss.

69.    The policy is not clear on what exactly is meant by having an "Umpire" involved, but upon information and belief, Dee Clary, then John Musante, and then Mr. Evans either was or attempted to be that "Umpire".

70.    On September 18, 2023, McKee Environmental completed environmental testing on the Jansons' home, and this testing revealed the presence of Silica dust contamination. McKee Environmental's report stated that the contaminated personal property was unsalvageable. To be clear, the negligence of Erie and its contractor(s) had now exponentially increased the damages to the Jansons' home and caused the destruction of the entirety of their personal property that was not damaged in the initial flooding event. This loss caused by Erie and their contractors was subsequent to and in addition to the initial June 18, 2023 flooding damage.

71.    Erie acknowledged that the Silica dust contamination of the Jansons' home was a covered loss under the Policy, but instead of treating it as a new and separate loss or claim, Erie treated this loss as if it were part of the Jansons' original claim for the water damage arising from

the interior flooding that occurred on June 18, 2023 when in fact, it was not part of that claim and but for the incompetence of the contractor(s) Erie hired to deal with the initial flooding issues, the entirety of their life long collection of personal property and personal heirlooms would still be intact.

72.    On October 5, 2023, Mr. Evans, on behalf of Erie, selected and unilaterally retained Deep River Restoration (DRR), run by Toby Newcomb ("Mr. Newcomb"), to take over the mitigation and remediation of the Silica dust contamination caused by Servpro's initial remediation.  DRR is the local qualified contracting company that upon information and belief initially refused to work with Erie's original adjustor Dee Clary assigned to the case.

73.    On October 6, 2023, the Janson's received a check from Erie in the amount of $18,743.62 to cover the cost of Servpro's bill, which had been reduced significantly due to the company's faulty workmanship. The Jansons signed this check over to Servpro to pay the company for its faulty remediation work.  The Jansons paid the bill because they were receiving harassing collection calls from Servpro.  Upon information and belief, this was an attempt by Erie to distance themselves from the tremendous additional damage unrelated to the initial loss caused by Servpro and or Erie's other unqualified and negligent contractors by having the Jansons, not Erie pay the bill.

74.    On October 19, 2023, the Jansons discovered that White Glove did not follow the proper protocols in the pack out of their personal belongings. An email from Evans indicated that White Glove would send an inventory of personal property removed from the home, however they did not take a written inventory when they were completing the pack out in June.  The Jansons received photos from White Glove of the personal property that was removed in June. These photos were not taken on site as they were packing items but were taken at their storage facility.  Some

of the items in the photos were not the Jansons' personal property. The Janson Family suspects that their personal property was mixed in with that of others or perhaps some of the more valuable items were stolen. Had the initial loss been dealt with promptly and professionally the majority of, if not all of the Jansons personal belongings would have never been affected.

75.    On October 25, 2023, DRR unsuccessfully attempted to patch and turn on the heated flooring system to maintain heat throughout the winter. It was discovered that the closed-loop heating pipes were damaged beyond repair, which caused difficulties with winterization of the Jansons' home.

76.    Also in November 2023, the Janson Family was evicted from the hotel room in the middle of the night due to Erie's delayed payment of the hotel's rental fee. This occurred again in February 2024.

77.    Thus, the Jansons had to consistently contact the hotel manager to ensure that the payment was up to date. The Jansons should not have had to undergo the stress and emotional toll associated with the constant uncertainty of Erie's payment status with the hotel.

78.    On November 5, 2023, the Jansons received an estimate for the repair and storage of the Grandfather Clock. Although the Grandfather Clock was repaired, it still remains in storage with the clock repair company. The Jansons are still paying the the clock repair company for storage and await reimbursement from Erie. Erie is consistently slow to provide such reimbursements to the Jansons.

79.    The Jansons repeatedly voiced their frustration to Mr. Evans about being forced to live in roach infested hotel room, with a tick infested yard. Several times, they unsuccessfully requested per diem payments so that they could secure their own alternate living. These requests were repeatedly denied by Erie.

14

80.     Consequently, the Jansons took the initiative to research rental housing in the area and found a suitable location.  Erie, however, indicated that any housing must go through their vendors.   Erie's vendors failed to find the same accommodation despite the fact the accommodation was advertised via Airbnb.

81.     Mr. Evans then indicated or hinted that the Janson's should evict a tenant from one of their rental properties, and then advertise that property at a market rate, implying that the Jansons could rent their own property via the vendor. The Jansons were uncomfortable with this proposed course of action, due to the unethical nature of Erie's request and the unfairness to their tenants.

82.     Ben Lenhart, forensic accountant was hired by Erie, and Lenhart was hired by Erie to process and allegedly expedite the reimbursement process for meals and receipts.  This made reimbursement more difficult and further limited the Janson Family's attempts to resolve the matter.

83.     On December 15, 2023, Erie was informed that the Jansons' driveway had been destroyed due to the construction vehicles needed for the pack out and remediation services provided by DRR, and that the remediation work destroyed the screens and several of the Andersen windows and doors.   Again, all damages created by Erie as had the initial mitigation and remediation been handled in a prompt and professional matter, these losses would have never occurred.

84.     Despite repeated efforts by Erie's unilaterally selected contractors, the damage to the Jansons' home caused by Servpro's faulty remediation work was never fully repaired, and to this date the home remains uninhabitable.

85.    Erie repeatedly delayed payment of cost for complete remediation while it hired testing companies, contractors, and engineers to examine the nature and extent of the Silica dust contamination effectively papering the Janson Family to confuse and delay settlement.

86.    In addition, Erie repeatedly and without good cause delayed payment for or reimbursement of the Jansons' hotel and food expenses, utility bills, storage costs, and other costs covered by the Policy.

87.    Further, Erie failed to investigate or advise the Janson's as to suitable alternate living accommodations outside of a hotel room.

88.    In January 2024, Mr. Newcomb provided a storage container to be used on the Jansons' property on site to store the Jansons' personal belongings, such as clothing and crockery, that had not been placed into storage with White Glove.  Mr. Newcomb also stated that he had begun work on a preliminary building damage report estimate using Xactimate Software.

89.    On January 18, 2024, Mr. Newcomb sent the Jansons the Xactimate report, which excluded repairs to the HVAC, electrical, and plumbing systems.

90.    Mr. Newcomb and Mr. Evans engaged in negotiations and discussions concerning Mr. Newcomb's Xactimate estimate, the cleaning and consolidation of the Jansons' remaining personal property, and the need for driveway repairs.

91.    On February 2, 2024, Mr. Evans reported that he had no suggestions regarding contractors to repair the Jansons' home.  He agreed to replace the Jansons' clothing rather than attempt to clean and store.  He also addressed the DRR report and its incompatibility with the unique nature of the Jansons' historic home.

92.    As time went on, it became more difficult to get Erie to pay for any of the bills they were obligated to cover.  Even though the Jansons provided an alternate mailing address for

16

documents and reimbursement checks, Erie continued to send reimbursement checks and other documents to the Jansons' home address (where Erie knew that no one resided), and were lost.

93.    By email dated February 2, 2024, Mr. Evans informed the Jansons that he was sending electrical, mechanical, and structural engineers to inspect the house for a consultation on how to repair HVAC, plumbing, and electrical systems.

94.    On March 8, 2024, Peter Janson met with engineers on site to inspect the property and outline damage.

95.    On March 11, 2024, Mr. Evans sent an email to the Jansons outlining the engineer visit from March 8. This email also addressed the return of Enservio to catalogue and dispose of clothing improperly left in non-climate controlled storage. Mr. Evans also addressed consolidating storage and moving personal property from the White Glove storage facility in Oxford to a location in South Hill for easier access. He did not address that Erie had neglected to pay for some of the storage they were already using or indicate that Erie had contracted for storage in South Hill. He addressed repair estimates for driveway. Evans indicated that he wanted the Jansons to take responsibility for securing the storage unit in South Hill and that Erie would reimburse for the storage. The Jansons did not agree to this due to slow reimbursement on other items. The email indicated a comp rate for housing and meal reimbursement with no clarification on finding suitable alternative housing.

96.    On March 27, 2024, the Janson's emailed Mr. Evans regarding several concerns including housing, storage, engineering studies, and their Antique Grandfather clock. In addition, the Janson's again asked to have funds directly deposited into their accounts. They updated the timeline for driveway repair and indicated damage to the front porch from the pack out. They

17

asked about maintaining the property through the summer months and indicated they had not heard from Erie's forensic accountant.

97.    On March 29, 2024, Mr. Evans emailed the Jansons and informed them that no progress had been made on the mechanical and electrical engineer reports.

98.    On April 10, 2024, the electricity to the Jansons' home was disconnected due to delinquent payment of the utility bill. The Jansons paid $150 per month to the electric company but had not paid the bill in full because they were awaiting reimbursement from Erie to cover overages that occurred as a result of the need for electric heating arising from the destroyed heated flooring system.

99.    On June 19, 2024, the Jansons hired an HVAC contractor to inspect and service the air handler for utilization in summer to minimize further deterioration of the property. The HVAC contractor discovered HEPA filters that were still contaminated with Silica. These were the same filters that Peter Janson showed to the environmental hygienist to ensure they were tested and included in the cleaning of the unit almost a year earlier.

100.    On June 20, 2024, the Janson's informed Erie of the continued contamination of the HEPA filter in the air handler. Fortunately, the unit had no power due to the electrical issues, so it was not turned on and did not recontaminate the house. The Jansons asked that a replacement HVAC system be included in the estimates to repair the home.

101.    On July 8, 2024, Mr. Newcomb informed the Jansons that the contaminated HVAC filter had been replaced when it had not been.

102.    In late July through September 2024, the Jansons repeatedly contacted Mr. Evans to express their frustration with the length of time it was taking Erie to make all necessary repairs

18

to their home. Mr. Evans apologized for the delay but continually indicated that the litany of reports were still incomplete.

103.    The Virginia State Corporation Commission Bureau of Insurance requires that communication take place every 45 days if a claim is being delayed or denied. Erie repeatedly sent "update" letters with little to no information in an attempt to comply with these requirements.

104.    Furthermore, the engineering reports used to determine the cost for repairs to the home that were received by the Janson Family explicitly stated that labor costs were not included, leaving the Janson Family wondering how can claims be settled and repairs be made if the cost of labor is not covered in the payout?

105.    Upon information and belief, Erie knew and fully understood the damages that had been caused by their inept contractors and was using this ongoing litany of reports to confuse, delay and either reduce or not pay a reasonable settlement that properly reflected the Jansons initial loss plus the subsequent damages directly caused by Erie, including the destruction of the entirety of their personal property.

106.    On October 16, 2024, Mr. Evans emailed the CLM investigation report and outlined a breakdown of repairs and costs to the Jansons. However, due to the size of the file, the Jansons were unable to download the report for review. The email included a copy of the cover letter that was sent along with a check from Erie to the Janson's in the amount of $187,925.29.

107.    Not only was the check for a mere fraction of the loss, but along with the check was a requirement that the Jansons act as contractors in completing the project.

108.    As the Jansons could not access this file due to its size, on October 31, 2024, a local insurance company downloaded the file sent to the Jansons and forwarded a copy to the Mecklenburg County Building inspector's office.

109.    On November 7, 2024, the Mecklenburg County Building inspector, Eli Jackson informed the Jansons that the repairs outlined in the CLM investigation report were not compliant with current Building Code requirements.  The Jansons informed Evans of this development via phone.

110.    The Jansons also told the building inspector that Erie said no permits were needed and that the Jansons were to act as contractors.  The building official quickly corrected them and made clear that permits and inspections were required and that the Jansons were not licensed contractors directly contradicting Erie's disingenuous attempt to settle the matter for pennies on the dollar while attempting to force the Janson Family to act as the Virginia Licensed General Contractors.

111.    On December 4, 2024, White Glove called the Jansons to demand payment for storage and stated that it could not continue to hold the Jansons' personal property without payment.  This was yet another payment to a contractor Erie hired that Erie refused to make.

112.    Furthermore, the Jansons received several calls from White Glove on several different occasions indicating that payment had not been received for storage of items. The Jansons then began contacting White Glove on a regular basis to ensure payment had been received.  If payment had not been received, the Jansons called Mr. Evans to ensure that payment from Erie to White Glove would be forthcoming.  The Jansons should not have had to endure the stress and emotional toll associated with Erie's uncertain payment status with White Glove, Erie's contractor.

113.    On December 5, 2024, now some 536 days after the loss, the Janson's called Mr. Evans to inform him about the lack of payment to White Glove and asked for an update on communication with the building inspector. The Janson's indicated that they still were unable to serve as a contractor or secure a contractor to even come out and give estimates for repairing their

20

home. They again requested a color hard copy of the report so that they could review it and provide it to any contractors who might be willing to come out. They also asked about heating through the winter to maintain the property. They reminded Mr. Evans that based on his directive, they had purchased a portable dehumidifier and portable air conditioning unit to maintain the property for the summer and that they had yet to be reimbursed for those expenses.

114.    On December 6, 2024, Mr. Evans emailed the Jansons and apologized for lack of a hard copy of the report. He stated that he was told verbally that there was no way to know what upgrades were needed to bring the house in compliance with the Building Code until a permit was pulled. This assertation was directly contradicted by the local building official as design and engineering work as well as cost estimates and a licensed contractor were pre-requisite to obtaining the necessary building permits.

115.    On December 24, 2024, Erie finally provided the Jansons with a black-and-white 500 page printed copy of the report.

116.    On March 20, 2025, the Jansons returned Erie's October 16, 2024, check in the amount of $187,925.29 and indicated that they rejected the amount.

117.    On April 1, 2025, the Jansons notified Mr. Evans via email that they had returned Erie's check and were rejecting the amount offered because they could not return the home to its original, pre-flooding, pre-loss condition for the amount indicated. At this point, the Jansons filed a report with the Virginia State Corporation Commission outlining the many delays by Erie.

118.    On April 22, 2025, Erie informed the Janson' that it was sending a revised building damage report with a higher estimated amount for repairs, and on April 24, 2025, the Jansons received a black and white copy of the updated building damage report and a check from Erie in the amount of $249,096.59. Still a mere fraction of the loss and replacement costs.

119.    Upon information and belief, this was another disingenuous attempt for Erie to avoid taking responsibility for the damages subsequent to the initial loss caused by their incompetent and inept agents and it now became clear that this was a disingenuous dawdling and delaying tactic to run the time out on the policy so that the Jansons could not sue for damages, as the policy clearly states "'We' may not be sued unless there is full compliance with all the terms of the policy. Suit must be brought within two years after the loss or damage occurs".

120.    Erie's updated damage report was essentially the same with some adjusted figures for specific items. The updated report specifically and deceitfully states: "No permit needed for repairs related to this claim." The Jansons know that this statement is false, and that Erie is systematically lying to them about this as well as the requirement that they act as contractor when they are not licensed and do not have the experience to do so.

121.    The Janson' rejected Erie's updated report and check in the amount of $249,096.59 as inadequate. They are unable to restore the home to the condition it was in prior to the interior flooding that occurred on June 18, 2023, for the amount Erie offered let alone repair the additional damages caused by Erie's contractors and continued dawdling and delaying tactics. This amount is not only insufficient, but also ignores the additional damage done to the home by Erie's agents and contractors. The Jansons home is approximately 2200 square feet and replacement estimates are in the $300 per square foot range exclusive of the lighting and in floor radiant heating systems as well as the upgraded Anderson windows and doors all of which were newly installed when the Jansons purchased the property and all of which Erie was aware of when they initially evaluated the property and insured it as a pre-requisite to the Jansons obtaining a mortgage and closing on the property to use as their primary residence.

122.    If Erie had promptly and efficiently investigated the water damage claim and had hired a qualified contractor to timely remediate the water damage, the premises could have been restored to a habitable state at a much earlier date. Because they did not, the Janson Family has effectively been paying a mortgage and other bills on an uninhabitable home that Erie refuses to fix per the terms of their contract.

123.    In the stead, Erie did everything they could to deny and delay the claim, using their adjustors to confuse and ignore the duty to "Umpire and Resolve" the matter. Upon information and belief, Erie not only knew they had seriously mismanaged the claim and by doing so increased the amount of the damages exponentially, but they also decided it was better to act like they wanted to settle while running the clock on the Janson's ability to take action against them and recover the true amount of their losses plus damages.

124.    These disingenuous actions include but are not limited to the following:

a.  Initially failing to visit the claim site in person, instead sending an independent contractor, who could not assess the situation properly because remediation work had not begun.

b.  Contracting and paying for completely un-necessary work to act is if they were busy trying to settle the claim.

c.  Hiring a port a toilet company.

d.  Hiring a crane to access the second floor because their contractors destroyed the stairs.

e.  Continuing to rent the hotel rooms when no longer needed to act as though they had properly managed the Janson's need for accommodation, thereby wasting thousands of dollars a week instead of settling claims.

f.  Denying the rent due on storage.

g.  Failing to pay directly for the repair and storage of the family heirloom Grandfather Clock.

23

h. Hiring a forensic accountant to allegedly expedite reimbursements, while actually making them more difficult.

i.  Sending volumes of reports including a large report via email, too large to download.

j.   Sending a paper copies of reports to the wrong address, and unneeded reports too lengthy to reasonably decipher,

k.  Contracting with structural engineer to study the home even though there was no indication of structural damage.

l.  Delaying and then eventually sending reimbursement checks via FedEx to the home address of the Janson's now uninhabitable home , where it was known that no one was available to take delivery of said payments.

m.  Sending periodic form letters that indicated nothing just to appear to maintain communications to appease Virginia SCC Insurance Regulators.

n.  Requiring the Jansons to use a text to claim system to keep a record for Erie. When after several attempts to use the system with no response from the adjuster it became obvious that the system did not work.

o.  Engaging Enservio to inventory, catalogue and dispose of the remaining personal property in the contaminated home. If this had been done following the initial water damage the loss of personal property would have been deminished instead of total.

p.  Sending reimbursements for a mere fraction of the total of the submitted receipts which were all reasonable expenses.

q.  Indicating that mileage reimbursement would be paid since the Jansons had to travel several miles farther on a daily basis for work and school, but not actually following through on mileage reimbursement.

r.  Having DRR complete and estimate with Xactimate software with full knowledge that the software was generic estimating software not compatible to the unique nature of the home and its specialized systems.

s.  Improperly issuing of reimbursement for unpaid invoices, hotel, contractor and others, even though the Jansons did not rent the hotel, or hire the contractors or pay anything other than day by day expenses out of pocket. The Jansons voided these reimbursements as it was unclear what Erie was trying to do about its obligations regarding the Janson Family housing situation.

In other words, systematically refusing to deal in good faith with clean hands and "Umpire" a resolution to these matters, and instead making a corporate decision to run the clock on the Janson's ability to be made whole again.

125.    If Erie had promptly and efficiently investigated the flooding incident, and had they not previously alienated the local contractor with the ability to fix the problems immediately, the destruction of Lutron system, the destruction of the undamaged floor heating system the resulting Silica dust contamination and the two year long ordeal caused by Servpro's faulty remediation work, either Erie or the Jansons could have retained qualified contractors to perform the necessary remediation and repair work, and the premises could have been restored to a habitable state at a much earlier date.

126.    Instead, upon information and belief, when Erie ascertained the damages, they had created subsequent to the Jansons original flooding claim, a decision was made to confuse and delay to mitigate Erie's damages.  At that time, Erie began using their claims and their required process to "Umpire" a reasonable resolution in bad faith to delay and deny the Jansons claim.

127.    Upon information and belief, Erie made a decision to pay hundreds of thousands of dollars on reports, engineering, hazmat cleanup, cranes and seldom used hotel rooms and self

storage to act like they were dealing in good faith when in fact, their actions indicate that a decision was made to interfere with and deny the Janson's claim long ago.

128.    Upon information and belief, Erie realized the damage they had done far exceeded that of the initial claim, Erie decided that paying what appears to be over a half million dollars to date to avoid paying the claim and delaying the matter past the two year time limit to sue for damages obligated to by their policy was and is a good business decision.

129.    Erie's pattern of behavior is exactly that which was outlined in Senator Josh Hawley's investigation of a June 2025 Senate Hearings on fraudulent, unconscionable and unethical practices now systematically used by insurance companies to deny claims in every state by people required by law and required by their mortgage lenders to enter these insurance contracts and pay the premiums.

130.    Per the hearing transcript, "when disaster, strikes, in their moment of utmost need, the insurance, companies come back to, them and they, delay. And they, deny and they offer excuses, and they send out two adjusters and three adjusters and fifteen adjusters and, twenty-five adjusters, and they constantly change, the, estimates and at the end of the day, they just won't pay what is due, what is required, what is just. And it's not a one-off situation. It's not like it's happened to just one family. It is a deliberate strategy to maximize profits. We're going to hear about it today. We're going to hear about it on this panel. Let me just give a brief overview of how it works. It does something basically like this when a disaster, destroys, let's say your home, the, insurance company sends out, an adjuster, often a third party, adjuster. That person writes up, a, report, often in good faith, doing their best to estimate the damages, and then what happens? Then the insurance company intervenes. Then the insurance company says you need to change the facts that you found. You need to change your estimates. You need to change within the report and they adjust

arbitrarily the award down, down, down, down. The policyholder never knows, and the policyholder gets no say in the process, and the policyholder is left to try to put back together life as these insurance companies make billions and billions of dollars in profits."

131.    Senator Hawley goes further outlining the McKenzie Report stating "You know, we, we believe this goes back to the 90s with what's called the McKenzie Report, a consulting firm sort of trained insurance companies to use their claims department as a profit center, and they actually trained their staff to come in and short people on claims. They did it specifically starting out with Allstate and then they took it on the road for almost every other insurance company. It is now basically industry standard. I will say there's nothing you're hearing that's unique. The people that are speaking are unique because they have the courage to do it, but I hear these stories every single day, and they are the exact same stories over and over and over and working class families getting taken advantage of by insurance companies without any ability to fight back.

132.    So, in closing Erie's actions here do not indicate an effort toward reasonable settlement, but in fact an effort to "Rip Off" the Janson Family as Erie knows they are "Easy Marks", desperate to get back in their home and apparently running out of time to do so.

133.    In closing the Plaintiffs reference Senator Hawley's May 2025 Senate Testimony regarding the Insurance Industry in its entirety.

### FIRST CAUSE OF ACTION
**BREACH OF CONTRACT**

134.    The Jansons repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

135.    At all times relevant, the Jansons have paid all premiums and fulfilled or performed all their obligations under the Policy.

136.    The Jansons timely and properly asserted claims for damages within the scope of coverage of the Policy.

137.    Erie had contractual duties to provide the Jansons with insurance coverages under the applicable Policy coverages, including the replacement cost coverages specifically alleged herein.

138.    Erie materially breached these contractual duties by, among other things:

A.    Failing to properly investigate and handle the Jansons' insurance claims in a timely and efficient manner;

B.    Unilaterally retaining Servpro, instead of a qualified remediation specialist, as the contractor to perform the remediation work to the Jansons' home caused by the interior flooding that occurred on June 18, 2023;

C.    Allowing its unilaterally selected contractor, Servpro, to perform unworkmanlike, deficient, and improper remediation of the Jansons' property damage, including causing the entire home and all the Janson's' personal belongings in the home to be contaminated by Silica dust;

D.    Allowing its unilaterally selected contractor, Servpro, to destroy the hydronic heated flooring system of the Jansons' home by destroying the pipes under the tile floor;

E.    Allowing its unilaterally selected contractor, Servpro, to attempt to move the heirloom Grandfather clock in the Jansons' kitchen, in direct contravention to the Janson's' instructions;

F.    Failing to fully repair or correct the deficient remediation work performed by Servpro in a timely manner;

28

G.    Repeatedly delaying payment of the cost for complete remediation caused by Servpro's faulty work while it hired testing companies, contractors, and engineers to examine the nature and extent of the Silica dust contamination in the Janson's' home;

H.    Not attempting in good faith to effectuate prompt, fair, and equitable settlement of the Jansons' claims for benefits where the obligation to pay has become reasonably clear;

I.    Unreasonably, repeatedly and without good cause withholding and delaying payments and reimbursements of the Jansons' hotel and food expenses, utility bills, storage costs, and other costs and living expenses covered by the Policy;

J.    Failing to investigate or advise the Jansons as to suitable alternate living accommodations outside of a hotel;

K.    Failing to make prompt, fair, and equitable settlements of all the claims;

L.    Failing to perform its contractual obligation to provide the Janson's with coverage for losses under the Policy unless it had a reasonable basis for denying the claim;

M.    Failing to initiate the appraisal process as set forth in the Policy.

139.    As a result of these breaches, the Jansons have been damaged in the amount of cost replacement coverage for the dwelling to which they are entitled under the Policy and the amount of coverage applicable to their lost personal property, and in an amount to be proved at trial, and for which the Jansons seek compensatory, general, and other monetary damages (including all foreseeable consequential and incidental damages for diminution in value, loss of use, hotel and other accommodation fees and living expenses, storage fees for their personal belongings, and other incidental damages and out-of-pocket expenses) in an amount to be determined at trial, plus interest.

140.    Further, the Jansons have been required to hire an attorney to remedy Erie's breaches of its insurance contract and negligent advice and the Jansons are entitled to an award of reasonable attorney's fees and costs under Va. Code § 38.2-209.

### SECOND CAUSE OF ACTION
### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

141.    The Jansons repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

142.    When Erie issued the Policy, it undertook and was bound by the covenants implied by law that it would deal fairly and in good faith with the Jansons, and that it would not engage in any acts, conduct, or omissions that would impair or diminish the rights and benefits due to the Janson's, according to the terms of the Policy.

143.    In addition, as part of its good faith duties owed to the Jansons, Erie undertook the following obligations:

A. To be fully honest in all its dealings with its policyholders, the Janson's;

B. To promptly and honestly investigate and evaluate the facts of coverages and amounts of losses pertaining to the loss and insurance claims, looking for the true facts in such a manner in order to obtain the full payment of benefits to its policyholders, the Jansons, as quickly as possible;

C. To properly investigate coverages and promptly evaluate the loss and damage following receipt of the notice of the loss, and to fully, and at its own expense, investigate and evaluate all loss and damage following receipt of the notice of loss;

D. To retain qualified and properly trained contractors and engineers to remediate the loss and damage following receipt of the notice of loss;

30

E. To ensure that all undisputed amounts and benefits would be paid promptly to the Jansons;

F. To ensure that the Jansons receive honest, full and prompt disclosure of the status of the claims investigation and evaluation; and

G. To perform its contractual obligation to provide the Janson's with coverage for losses under the Policy unless it had a reasonable basis for denying the claim.

H. Erie, acting through its agents, servants, representatives, and employees, failed to properly investigate, evaluate, and adjust the Jansons' claims for benefits in good faith and has further failed to deal fairly with the Jansons.

144.    Erie breached the implied covenant of good faith and fair dealing arising out of the Policy by, unreasonably and in bad faith, among other conduct:

A.    Failing to properly investigate and handle the Jansons' insurance claims in a timely and efficient manner;

B.    Unilaterally retaining Servpro, rather than a qualified remediation specialist, as the contractor to perform the remediation work to the home caused by the interior flooding that occurred on June 18, 2023;

C.    Allowing its unilaterally selected contractor, Servpro, to perform unworkmanlike, deficient, and improper remediation of the Jansons' property damage, including causing the entire home and all the Jansons' personal belongings in the home to be contaminated by Silica dust;

D.    Allowing its unilaterally selected contractor, Servpro, to destroy the hydronic heated flooring system of the Jansons' home by destroying the pipes under the tile floor;

E.    Allowing its unilaterally selected contractor, Servpro, to attempt to move the heirloom Grandfather clock in the Jansons' kitchen, in direct contravention to the Jansons'

31

instructions;

F. Failing to fully repair or correct the deficient remediation work performed by Servpro in a timely manner;

G. Repeatedly delaying payment of the complete cost of remediation caused by Servpro's faulty work while it hired testing companies, contractors, and engineers to examine the nature and extent of the Silica dust contamination in the Jansons' home;

H. Not attempting in good faith to effectuate prompt, fair, and equitable settlement of the Jansons' claims for benefits where the obligation to pay has become reasonably clear;

I. Unreasonably, repeatedly and without good cause withholding and delaying payments and reimbursements of the Jansons' hotel and food expenses, utility bills, storage costs, and other costs and living expenses covered by the Policy;

J. Failing to investigate or advise the Jansons as to suitable alternate living accommodations outside of a hotel;

K. Failing to make prompt, fair, and equitable settlements of all the Jansons' claims; and

L. Failing to initiate the appraisal process as set forth in the Policy.

145.    As a direct and proximate result of the above-referenced breach, the Janson's have had to retain an attorney to enforce their rights to the insurance coverage to which they are entitled under the Policy, and have thereby been injured and damaged.

146.    The Jansons, therefore, are entitled to recover and seek in connection with this Cause of Action:  (a) an award of general damages and other monetary damages, including all foreseeable consequential and incidental damages for diminution in value, loss of use, hotel and other accommodation fees and living expenses, storage fees for their personal property, and other

incidental damages and out-of-pocket expenses, in an amount to be determined at trial, plus interest; (b) costs of suit; and (c) reasonable attorney's fees in connection with this action.

### THIRD CAUSE OF ACTION
### BAD FAITH DENIAL OF INSURANCE CLAIM

147.    The Jansons repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

148.    Erie has breached its contractual obligation to pay the full replacement cost of the dwelling and the full cost of the personal property damaged in the covered interior flooding of the Janson's' home that occurred on June 18, 2023.  (*See* Exhibit A, Policy, p. 11.)

149.    Erie has also breached its contractual obligation to pay the full replacement cost of the dwelling and the full cost of the personal property damaged in the covered faulty remediation work performed by Servpro.  (*See* Exhibit A, Policy, p. 11.)

150.    In addition, Erie has breached its contractual obligation to pay the full cost for the Jansons' personal property damaged in the faulty pack out and storage by White Glove.

151.    Erie further breached its contractual obligation to promptly pay or provide full reimbursement for the Jansons' hotel and food expenses, utility bills, storage costs, and other costs and living expenses covered by the Policy;

152.    In addition, Erie breached its contractual obligation to investigate or advise the Janson's as to suitable alternate living accommodations outside of a hotel.

153.    Erie's breaches of its contractual obligations were in bad faith because, *inter alia,* Erie knew or should have known that there was no reasonable basis to delay full payment of the above items to the Janson's, yet it acted in such a dilatory manner that full payment has not been offered even two years after the date of loss.

33

154.    Erie's bad faith refusal to satisfy its contractual obligations forced the Janson's to initiate this case and to thereby incur unnecessary legal fees and costs, to obtain the coverage due to them under the Policy.

155.    Erie's conduct constitutes bad faith under the common and statutory law of Virginia.

156.    Because of its bad faith denial of coverage, Erie is liable to the Jansons for punitive damages as well as consequential damages, including without limitation, attorney's fees and other expenses in bringing this action under Va. Code § 38.2-209, loss of use, hotel and other accommodation fees, storage fees for their personal belongings, and other incidental damages and out-of-pocket expenses.

WHEREFORE, the Jansons demand judgment against Erie, and in addition ask that this Court:

(i)     Award damages to the Jansons in the amount of cost replacement coverage for the dwelling and the personal property costs to which they are entitled under the Policy, and in an amount to be proved at trial,;

(ii)    Award the Jansons general damages and other monetary damages, including all foreseeable consequential and incidental damages for diminution in value, loss of use, hotel and other accommodation fees, storage fees for their personal belongings, and other incidental damages and out-of-pocket expenses, in an amount to be determined at trial, plus interest;

(iii)   Award the Jansons costs of suit and reasonable attorney's fees;

(iv)    Award the Jansons punitive damages in an amount to be established at trial; and

(v)     Award such other and further relief to which the Jansons may show themselves justly entitled.

34

## **VERIFICATION**

Pursuant to Virginia Code § 8.01-4.3, I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:   June 17, 2025


\_\_/S/ Peter Janson_____
PETER JANSON

**<u>VERIFICATION</u>**

Pursuant to Virginia Code § 8.01-4.3, I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  June 17, 2025

\_\_\_/S/ Celeste Janson_____
CELESTE JANSON

Dated this 17th day of June, 2025.

Respectfully submitted,

_____/S/ John M. Janson_____
John M. Janson, Esquire
VSB #91236
3797 Chaptico Road
South Hill, VA  23970
Telephone:  (434) 953-8794
Email:  johnmjanson@gmail.com

*Counsel for Plaintiffs Peter Janson and Celeste Janson*

37